IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 13-138 |
| | ) |
| ANDRE DWAYNE RUFFIN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court is the MOTION TO SUPPRESS EVIDENCE SEIZED IN VIOLATION OF U.S. CONST. AMEND. IV (ECF No. 40) filed by Defendant Andre Ruffin with brief in support (ECF No. 67).[1] The government has filed a response in opposition (ECF No. 58). The Court held an evidentiary hearing on May 14, 2014; the transcript of that proceeding has been filed of record (ECF No. 73). The parties have since filed supplemental briefs (ECF Nos. 77, 78), which were due on or before July 18, 2014. (ECF No. 75). Neither party filed a rebuttal/response within the seven-day allotment set by the Court at the conclusion of the hearing. (ECF No. 73 at 99). Accordingly, the motion is ripe for disposition.

### I.      Background[2]

On May 7, 2013, a federal grand jury sitting in the Western District of Pennsylvania returned a one-count Indictment against Ruffin which charged him with the crime of Possession of a Firearm by a Convicted Felon on or about April 22, 2013 in violation of 18 U.S.C. §§

---

1. There have been several duplicative filings in this case due to docketing errors: ECF Nos. 39 and 40 (the motion to suppress); ECF Nos. 65 and 66 (the motion for reconsideration); ECF Nos. 67 and 68 (the brief in support of the motion for reconsideration); and ECF Nos. 78 and 81 (the supplemental briefs) are nearly identical except for Defendant's non-compliance with the signature requirement and the Clerk of Court's modifications to add additional document linkage. However, Defendant's brief filed at ECF No. 81 omits nearly two pages of argument that he includes in his original brief at ECF No. 78. The Court has nevertheless considered all filings of record.

2. The Court has previously outlined the procedural history of this matter in earlier Memorandum Orders. *See* ECF Nos. 59, 62; *see also* ECF No. 70. The Court incorporates those discussions by reference and repeats only those matters relevant to the pending issues.

922(g)(1), 924(e). On October 15, 2013, the government filed a Superseding Indictment which charged Ruffin with the crime of Possession of Firearms *and Ammunition* by a Convicted Felon on or about April 22, 2013 in violation of the same federal statutes.

Ruffin has filed a motion to suppress evidence and a supplement thereto. (ECF Nos. 40, 53). The government filed an omnibus response. (ECF No. 58). The Court ruled on several aspects of those motions in a March 6, 2014 Memorandum Order in which it deferred a decision on the suppression motion(s) in the original filing pending an evidentiary hearing / oral argument, granted in part and denied in part the motion for pretrial discovery, and denied the supplemental motion to suppress / the request for a *Franks* hearing. (ECF No. 59). A joint filing followed to notify the Court (1) that the government would not offer into evidence statements made by Ruffin which he sought to suppress in light of *Bailey v. United States*, 133 S.Ct. 1031 (2013); (2) that the parties agreed there was no need for oral argument on any then-existing legal issues; and (3) that Ruffin intended to file a motion for reconsideration to address the *Franks* issue and related legal matters. Accordingly, the Court cancelled the evidentiary hearing / oral argument and set a briefing schedule for the motion for reconsideration. (ECF No. 64).

After the parties briefed the issues, the Court granted in part the motion for reconsideration and scheduled an evidentiary hearing. The Court did, however, limit the hearing to (1) the alleged staleness of the information provided in the April 22, 2012 search warrant application and affidavit of probable cause; and (2) the scope of the protective sweep conducted during the execution of the initial search warrant. (ECF No. 70).

On May 14, 2014, the Court held an evidentiary hearing at which it admitted evidence and heard testimony from three government witnesses. (ECF Nos. 71, 72). At the request of defense counsel, the Court ordered supplemental briefing at the conclusion of the hearing.

## A. Factual Background

The charges against Ruffin stem from a series of events that unraveled after his so-called common-law wife, Leicia Jackson, died intestate on May 18, 2012. Prior to her death, Leicia and Ruffin shared a home located in the Munhall Borough at 704 East 14th Avenue, Homestead, Pennsylvania. The title to the property was in Leicia's name. Loretta Jackson, Leicia's mother, was appointed as the personal representative of her daughter's estate on June 27, 2012.

Within days of the appointment, Ruffin sent Loretta a letter in which he challenged her right to the property. The letter stated:

> Dear ms loretta jackon,
>
> sorry to inform you you are mistaken. you are not executor of property sitting on 704 e 14th ave. me and leicia are common law married. since she is my wife proper channels must be taken. you have right to nothing. you have no jurisdiction or authority in this matter. your intentions violate contracts between my wife (leicia jackson) and I. I am the owner of the property. only I will dictate and give commands concerning my property. thank you.
>
> sincerely
>
> leicia's husband
> andre ruffin [sic]

(ECF No. 58-1 at 2). According to court records, Loretta and Ruffin were scheduled to have a hearing regarding the probate of the estate on April 12, 2013.

On April 11, 2013, Loretta was shot and killed inside of her home. Officers from the West Mifflin Police Department were dispatched to the residence after the activation of a Guardian Protection Alarm System ("Guardian") and the receipt of a 9-1-1 call from an unidentified woman inside the home. Upon their arrival, police officers found one woman inside the residence in a locked bedroom as well as Loretta inside a second bedroom with multiple

gunshot wounds to her body. The same day, the West Mifflin Police Department requested investigative assistance from the Allegheny County Police Department's Homicide Section.

On April 12, 2013, Detective Scott Towne of the Homicide Section went to 704 East 14th Avenue in an attempt to speak with Ruffin about Loretta. Detective Towne instead encountered Ruffin's girlfriend, Sataria Hamlin, at the residence, gave her a business card, and asked that Ruffin contact him via telephone. Additionally, Detective Towne observed a video surveillance system on the exterior of the structure.

On April 15, 2013, Ruffin voluntarily provided a statement to Detectives Towne and Caruso at the Allegheny County Police Headquarters. Ruffin told the detectives that he was at home on the evening of Loretta's murder, that he did not leave the house and that Hamlin was with him that night.

Sometime between April 15, 2013 and April 22, 2013, Detective Michael Feeney of the Allegheny County Police Department informally spoke with his colleagues in the Homicide Section regarding the investigation into Loretta's death. At this weekly "roundtable" at which the officers discuss open cases, Detective Feeney learned of the surveillance system that Detective Towne had observed. Detective Feeney also learned that Ruffin provided an alibi for his whereabouts during the homicide. After receiving this information, Detective Feeney proposed that they obtain a search warrant to recover the surveillance data in order to corroborate or disprove Ruffin's proffered defense.

On April 22, 2013, Detective Feeney applied for and obtained a search warrant for the video surveillance system at 704 East 14th Avenue. (ECF No. 58-1). The Affidavit of Probable Cause specified that Officer Jamie Caterino of the Munhall Police Department confirmed the

continued presence of the six cameras mounted to the exterior of the residence and detached garage.

Prior to the execution of the search warrant, Officer Caterino continued to surveil 704 East 14th Avenue when he observed Ruffin exit the residence and depart in his vehicle. Upon learning this information, Detective Feeney and several other officers conducted a car-stop of Ruffin who stated that his residence was not occupied.[3] Detective Feeney relayed this information to the officers executing the search, which include Allegheny County Homicide Detective Lane Zabelsky.

At 704 East 14th Avenue, Detective Zabelsky and Officer Caterino approached the house and announced their presence at which time Hamlin opened the door. Based on the apparent contradiction between Ruffin's statements and Hamlin's presence, Detective Zabelsky performed a protective sweep of the residence. Detective Zabelsky observed one firearm in an open dresser drawer and another in a safe which had a slightly ajar door. According to the government, Detective Zabelsky observed both firearms in "plain view."

Based on Detective Zabelsky's observations, Detective Feeney applied for and obtained a second warrant on April 22, 2013 to search for and seize the two firearms and any other weapons in the residence. Police later recovered, *inter alia*, (1) a Spike's Tactical Receiver; (2) a Rock River Arms pistol; and (3) multiple rounds of ammunition. (ECF No. 58-2). According to the Superseding Indictment, Ruffin is prohibited from possessing firearms and ammunition due to prior felony convictions.

---

3. In the April 22, 2013 Affidavit of Probable Cause authored by Detective Feeney, he attests that the traffic stop was conducted "[i]n an effort to maintain contact with Ruffin," prevent any destruction of evidence of any networked DVR/NVR (Digital Video Recorder/Network Video Recorder) utilizing a cellular phone to remotely control the unit(s) inside the structure" and to "permit entry to conduct the search." (ECF No. 58-2 at 2).

5

### B. The Evidentiary Hearing

Detectives Feeney, Towne, and Zabelsky testified at the May 14, 2014 evidentiary hearing. The Court found their respective testimony highly credible.

### A. Detective Michael Feeney

Detective Feeney has been employed by the Allegheny County Police Department for almost twelve years. Over the course of his career, Detective Feeney was stationed at the Pittsburgh International Airport for two years, in the narcotics unit for approximately six years, and in the Homicide Section since October 2010.

Throughout his time in the narcotics unit, Detective Feeney became familiar with and developed an expertise in various forms of electronics-based evidence collection. Moreover, Detective Feeney has obtained certifications through the Law Enforcement Video Association ("LEVA"). As part of his LEVA training, Detective Feeney attended two separate, one-week long sessions at the University of Indianapolis which covered forensic video analysis theory and the proper recovery and preservation of video-based evidence such as digital video recorders ("DVR(s)").[4] Since Detective Feeney has earned his LEVA certification, he has functioned as a part-time officer in the audio-visual unit, participated in obtaining / executing warrants relating to surveillance and digital video on about five occasions, and extracted digital multimedia evidence in at least one-hundred cases.

Detective Feeney first learned of the Loretta Jackson homicide and the related investigation of Ruffin on April 11, 2013. As part of his duties that day, Detective Feeney was

---

4. At the hearing, Detective Feeney described a DVR as a small electronic device that captures the signal from cameras and stores the date on a hard drive for either contemporaneous or later review. The storage capacity for DVRs depends on the system, configurations, and storage capacity of the hard drive which further depends on a number of factors. (ECF No. 73 at 9-12). As counsel elicited during cross-examination, a DVR system can overwrite itself in a relatively short period of time, such as the twelve-day gap between when Detective Towne first observed the cameras and when Detective Feeney applied for and obtained the search warrant. Detective Feeney did not include this information in his Affidavit of Probable Cause or otherwise convey it to reviewing authority.

responsible for checking with and obtaining data from Guardian regarding the security system at Loretta's residence. Detective Feeney was not the primary investigator in that case; rather, he acted in a supportive capacity after he proposed to his colleagues that they obtain a warrant for the video surveillance system.

While police officers were executing the search warrant at 704 East 14th Avenue, Detective Feeney requested the presence of the Medical Examiner's Office to take photographs of the residence and the evidence prior to its seizure. At the hearing, Detective Feeney viewed several photographs depicting 704 East 14th Avenue as it appeared on April 22, 2013 and identified for the Court the DVR system(s) at the residence. (ECF No. 73 at 19-24). Detective Feeney likewise confirmed the two search warrant applications that he authored. The photographs and the search warrants were admitted into evidence without objection. (ECF No. 73 at 3).

After the protective sweep, Detective Feeney personally examined the DVR system(s) in 704 East 14th Avenue. Before his inspection, Detective Feeney did not know whether the surveillance system could record, whether it was digital or analog, or whether it had been tampered with or overwritten between April 10, 2013 and April 22, 2013. Detective Feeney also had never viewed the residence prior to the execution of the search warrant. Nevertheless, Detective Feeney testified that an individual cannot decipher the storage capacity of a DVR, its functionality, or capabilities without physically manipulating the unit.

### B. Detective Scott Towne

Detective Towne has spent the past twenty-two years in law enforcement with the last eleven-and-one-half years in the Homicide Section of the Allegheny County Police Department.

As an investigator in the Loretta Jackson homicide, Detective Towne first became aware of the investigation of Ruffin on April 11, 2013.

At the hearing, Detective Towne testified to his brief, five-minute interaction with Hamlin on April 15, 2013, his conversations with Ruffin, and his informal conversation with his colleagues during their "roundtable" discussion. Detective Towne further testified that he did not author a police report with respect to his April 12, 2013 visit to 704 East 14th Avenue and that he could not recall the precise date at which he discussed the surveillance equipment.

### C. Detective Lane Zabelsky

Detective Zabelsky has been employed in law enforcement since approximately 1997. Detective Zabelsky first worked as a police officer in the United States Marine Corps from 1997 to January of 2003; he then joined the Allegheny County Police Department where he served until January 2014; and he is currently assigned as a Task Force Officer with the Federal Bureau of Investigation ("FBI").

Throughout his career, Detective Zabelsky has participated in the execution of dozens of warrants. Based on his training and experience, Detective Zabelsky testified that officers often perform a "protective sweep" as part of executing a search warrant. Detective Zabelsky explained that this practice is "to assure that nobody is going to jump out at you from a closet, underneath the bed, [or] out of the cellar" and that officers look "[a]nywhere that a human being could jump out at you" or "[a]nywhere somebody could be hiding." (ECF No. 73 at 57).

While working for Allegheny County, Detective Zabelsky assisted his colleagues in the execution of the April 22, 2013 search warrant at 704 East 14th Avenue.[5] In executing the search

---

5. Detective Zabelsky had prior law enforcement experiences in the Munhall neighborhood, which included several instances of violence such as shootings and homicides. Detective Zabelsky was aware that Ruffin had a prior criminal history which included allegations of violence and prohibited him from carrying a firearm and that he was a suspect in a recent homicide.

8

warrant, Detective Zabelsky knocked on the front porch door for several minutes until Hamlin eventually answered. After encountering Hamlin at what Ruffin described as an empty residence, Detective Zabelsky entered the household and went upstairs to conduct a protective sweep while the other police officers remained downstairs. Detective Zabelsky described the layout of the upstairs as having three bedrooms with two at the front of the house and another in the rear, a bathroom immediately adjacent to the top of the staircase, as well as some closets and miscellaneous storage areas.

Detective Zabelsky first inspected the bathroom and then proceeded to the bedroom at the rear of the house. In that room, Detective Zabelsky "[l]ooked everywhere a human being could hide" while observing electronic devices, a dresser to the right of the entrance, and a large bed in the center of the room. (ECF No. 73 at 61). As he exited the room, Detective Zabelsky walked past the dresser and noticed what he recognized as a holstered handgun in the top drawer which was slightly open. Detective Zabelsky did not open any drawers to locate the handgun; rather, he testified that it "caught his eye."[6] After observing the handgun, Detective Zabelsky informed Officer Caterino of its presence and continued to the next bedroom.

---

6. In an exchange with defense counsel, Detective Zabelsky testified as follows:

> Q. You looked in that drawer because you knew my client was not permitted to own firearms; is that correct?
> A. I didn't look in the drawer. The drawer was opened.
> Q. You had to look in the drawer to see the gun; right? Your eyes had to physically look into the drawer to see the firearm; is that correct?
> A. Absolutely.
> Q. And the reason that your eyes physically looked into the drawer to see the firearm was because you knew my client was prohibited from possessing firearms; correct?
> A. I was leaving the bedroom, sir. The dresser was in the way. I didn't want to run into the dresser. If you're walking out of somewhere, you use your eyesight, and it was opened. You see a pink elephant, you recognize the pink elephant. That's the pink elephant. That's what scares me every night I go to sleep is guns . . . .

(ECF No. 73 at 78-79). Similarly, Detective Zabelsky testified that "[i]n a foreign house, your eyes go everywhere." (ECF No. 73 at 79).

As Detective Zabelsky swept the second bedroom, he noticed a safe with a slightly ajar door positioned against the front exterior wall of the house between the bed and a window. Inside the safe, Detective Zabelsky observed what he recognized as an AR-15/M4 assault rifle. Detective Zabelsky did not first open the safe to locate the firearm, but instead noticed the rifle as he examined the area on the far side of the bed to check for a person.[7] Afterward, Detective Zabelsky finished his protective sweep of the upstairs.

## II.  Standard of Review

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The threshold requirement for issuance of a warrant is probable cause. *Illinois v. Gates,* 462 U.S. 213 216 (1983). In reviewing a search warrant application and considering all of the circumstances described in the affidavit, there must be sufficient evidence presented that demonstrates that there is a "fair probability" that evidence of a crime will be located before validating a warrant. *Id*. at 238; *United States v. Ritter,* 416 F.3d 256, 262-63 (3d Cir. 2005). Probable cause is a "fluid concept-turning on the assessment of

---

7. Much like the earlier exchange, defense counsel asked Detective Zabelsky "why is it that your eyes go to the interior of that safe when you know that there's no possible way a human being can emerge from that safe?" (ECF No. 73 at 85). Detective Zabelsky responded in a similar fashion:

> It's a part of the room, sir. You can't select what you see when you go into a room. I was never in that room before, and I haven't been in that room since, but when you're a part of something that when you go into, you're a little bit wound tight and you're, frankly, a little scared because you don't know what you're getting into. I've had more than one person jump out of a closet at me.

(ECF No. 73 at 86).

probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

When a warrant is issued and later challenged, a deferential standard of review is applied in determining whether the magistrate judge had a "substantial basis" for finding that probable cause existed. *Ritter*, 416 F.3d at 264. Although, the decision of the issuing officer should be afforded great deference, *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993), the reviewing court should not "simply rubber stamp a magistrate [judge's] conclusion." *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983), *cert. denied sub nom., Sanchez v. United States*, 466 U.S. 904 (1984).

Rather, the role of the reviewing court is to determine whether the magistrate judge had a substantial basis for determining that probable cause existed and not to decide probable cause de novo. *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010). "If a substantial basis exists to support the magistrate [judge's] probable cause finding, [the Court] must uphold that finding even if a 'different magistrate judge might have found the affidavit insufficient to support a warrant.'" *Id*. In so doing, the Court must confine itself to the affidavit and cannot consider other portions of the record. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). When resolving questionable cases, the deference given warrants should prevail. *Gates*, 462 U.S. at 237 n.10; *United States v. Jones,* 994 F.2d 1051, 1055 (3d Cir. 1993).

### III. Discussion

Ruffin now moves the Court to suppress the items of contraband seized from 704 East 14th Avenue and charged in the Superseding Indictment. For the reasons that follow, the Court will deny the motion to suppress.

### A. Staleness

The "'[a]ge of the information supporting a warrant application is a factor in determining probable cause.'" *United States v. Vosburgh*, 602 F.3d 512, 528 (3d Cir. 2010) (quoting *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)). "If too old, the information is stale, and probable cause may no longer exist." *Harvey*, 2 F.3d at 1322. But age alone is not determinative. *United States v. Vosburgh*, 602 F.3d 512, 529 (3d Cir. 2010); *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002).

The reviewing court must instead examine, on a case-by-case basis, the: (i) nature of the crime; and (ii) the type of evidence sought by the warrant. *Zimmerman*, 277 F.3d at 426. Moreover, "where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005). "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant. Rather, [the Court] must also examine the nature of the crime and the type of evidence." *Harvey,* 2 F.3d at 1322. "[W]hen an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.'" *Tehfe*, 722 F.2d at 1119 (*quoting United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973)).

Applying these considerations, Court finds that the information provided by Detective Feeney in his April 22, 2013 Affidavit of Probable Cause was not stale. In his Affidavit, Detective Feeney presented in detail the relevant timeline for review by the magistrate judge who found that there was probable cause to issue the search warrant. A review of this information reflects a measured investigation without unnecessary delay: the detectives promptly applied for

the search warrant after they became aware that potential evidence in a murder investigation existed at 704 East 14th Avenue. This information presented the magistrate judge with a substantial basis for determining that probable cause existed. Moreover, the passage of time between which Detective Towne first observed the surveillance system and the issuing authority approved Detective Feeney's application (*i.e.*, a mere ten days) was not so unreasonable as to render the information stale for purposes of determining whether the search warrant was supported by probable cause. The gap is even less—seven days—when considered from the date that Ruffin first provided his alibi defense. Nevertheless, the Court recognizes that age alone does not determine staleness.

But even when considering the other relevant factors, the Court cannot conclude that the information was stale. The Court recognizes that the "nature of crime" is not a continuous event such as protracted narcotics operation; however, the type of evidence sought by the search warrant provided a reasonable belief that evidence of a crime would be found or recovered. As Detective Feeney made clear in his Affidavit of Probable Cause: In "[his] training and experience dealing with surveillance video and multiple recoveries of video admitted into evidence . . . the videos have usually all been recovered and stored within a recording device" and "multi-camera systems are] usually recorded digitally onto a DVR and stored for subsequent review." (ECF No. 58-1 at 3). With this information, the magistrate properly approved the search warrant application. Accordingly, in light of the totality of the circumstances, the Court finds the search warrant was supported by probable cause.[8]

---

8. In the alternative, the government argues that the good faith exception to the exclusionary rule would apply if the Court were to assume arguendo that the affidavit was not sufficient to establish probable cause. The Court agrees.

## B. Protective Sweep

Law enforcement officials executing a warrant may conduct a protective sweep to look for other persons and/or safety threats. *See generally Maryland v. Buie*, 494 U.S. 325 (1990). The sweep allows for a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327.

Although *Buie* involved a protective sweep incident to arrest, courts have applied it outside that context. *See, e.g.*, *United States v. Hassock*, 631 F.3d 79, 87 (2d Cir. 2011). This includes a protective sweep incident to the execution of a search warrant. *See United States v. Werra*, 638 F.3d 326, 350 (1st Cir. 2011). As the United States Court of Appeals for the Seventh Circuit has observed, "the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search." *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) (collecting cases). "What matters are the specific facts that would give a reasonable officer, who is lawfully inside a home, a 'reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ ] the officer in believing that the area swept harbored an individual posing a danger to the officer or others.'" *Id.* (quoting *Buie*, 494 U.S. at 327).

Here, the specific facts demonstrate that the officers were justified in performing the protective sweep. The officers were executing a search warrant in connection with a homicide investigation in a high-crime area where they have personally experienced violent incidents. Upon their arrival, the officers were also confronted with an individual at the residence after knocking and announcing their presence for several minutes after Ruffin had claimed that the

house was empty. Based on these circumstances, the Court finds that the executing officers had a reasonable, individualized suspicion that the residence posed a danger to them or others.

### C. Plain View

While conducting a search or a protective sweep, the "plain view" doctrine also applies. *See, e.g.*, *United States v. Russell*, CR.A.10-186-1, 2011 WL 1603379 (E.D. Pa. Apr. 27, 2011). There are three requirements for valid seizures of evidence in plain view: (1) "the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed;" (2) "the incriminating character of the evidence must be immediately apparent;" and (3) "the officer must have a lawful right of access to the object itself." *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citations and quotation marks omitted).

The Court finds that the scope of the protective sweep was entirely proper and that the firearms were observed in plain view. At the hearing, Detective Zebelsky thoroughly demonstrated how he proceeded through the residence only to ensure that no person was present who may pose a risk of harm to himself or others. Detective Zebelsky also credibly testified that he searched only those areas where a person could be found and that he observed a handgun in an open dresser drawer and a rifle in an open safe while sweeping the upstairs bedrooms—both of which he immediately recognized as a firearm. The uncontroverted record evidence supports this testimony. Accordingly, the Court finds no basis for suppressing the ultimate seizure of the firearms observed in plain view during a fully justified protective sweep

### IV. Conclusion

For the reasons hereinabove stated, the Court will deny the motion to suppress evidence. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 13-138 |
| | ) |
| ANDRE DWAYNE RUFFIN, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 15th day of August, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION TO SUPPRESS EVIDENCE SEIZED IN VIOLATION OF U.S. CONST. AMEND. IV (ECF No. 40) filed by Defendant Andre Ruffin is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a Pre-Trial Conference is scheduled for Tuesday, August 19, 2014 at 1:30 p.m. in Courtroom 6C, United States Courthouse, 700 Grant Street, Pittsburgh, PA 15219.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc: Jonathan B. Ortiz
Email: jonathan.ortiz2@usdoj.gov

Patrick K. Nightingale
Email: pknightingale@mac.com

(via CM/ECF)